**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PG PUBLISHING COMPANY d/b/a | ) | |
| *THE PITTSBURGH POST-GAZETTE*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-960 |
| | ) | Judge Nora Barry Fischer |
| CAROL AICHELE, in her capacity as | ) | |
| SECRETARY OF THE | ) | |
| COMMONWEALTH; the | ) | |
| ALLEGHENY COUNTY BOARD OF | ) | |
| ELECTIONS; and MARK WOLOSIK, | ) | |
| in his capacity as DIVISION | ) | |
| MANAGER OF THE ALLEGHENY | ) | |
| COUNTY ELECTIONS DIVISION, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I.    Introduction

The Defendants in this action have filed motions to dismiss the Plaintiff's amended

complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Docket Nos. 30

& 32. The Plaintiff has moved to strike portions of a brief filed in support of one of the pending

motions to dismiss. Docket No. 42. The Plaintiff also asks the Court to take judicial notice of

comments reportedly made by Allegheny County Executive Richard Fitzgerald ("County

Executive") during a recent press conference. Docket No. 43. In the event that such judicial

notice is taken, the Plaintiff seeks leave to file a supplemental brief discussing the relevance of

the County Executive's comments to this case. Docket No. 44. In addition, the Plaintiff and the

county defendants have filed motions requesting the entry of a consent order that would

terminate this action. Docket Nos. 52 & 58. Because the amended complaint "fail[s] to state a

claim upon which relief can be granted," the motions to dismiss will be granted pursuant to Rule 12(b)(6). FED. R. CIV. P. 12(b)(6); Docket Nos. 30 & 32. The remaining five motions will be denied. Docket Nos. 42, 43, 44, 52 & 58.

## II.    Background

Plaintiff PG Publishing Co. ("PG") is the publisher of the *Pittsburgh Post-Gazette*, which is a daily newspaper circulated throughout western Pennsylvania. Docket No. 28 at ¶ 4. Defendant Carol Aichele presently serves as the Secretary of the Commonwealth of Pennsylvania ("Secretary"). *Id.* at ¶ 5. The Allegheny County Elections Division ("Elections Division") is charged with the duty of administering the Commonwealth's election laws and regulations throughout Allegheny County, Pennsylvania. *Id.* at ¶ 6. Defendant Mark Wolosik currently serves as the Division Manager of the Elections Division ("Division Manager"). *Id.* at ¶ 7.

The Pennsylvania Constitution gives the Commonwealth's General Assembly the authority to enact legislation governing the conduct of elections.[1] PA. CONST., ART. VII, § 6; *Mixon v. Commonwealth of Pennsylvania*, 759 A.2d 442, 450 (Pa.Commw.Ct. 2000). Article VII, § 4, of the Pennsylvania Constitution mandates that "secrecy in voting be preserved." PA. CONST., ART. VII, § 4. Pursuant to its regulatory authority, the General Assembly has enacted 25 PA. STAT. § 3060, which provides:

> **§ 3060.  Regulations in force at polling places**
> (a) Until the polls are closed, no person shall be allowed in the polling place outside of the enclosed space at any primary or election, except the watchers, voters not exceeding ten at any one time who are awaiting their turn to vote, and peace officers, when necessary for the preservation of the peace.  No elector shall be allowed to occupy a voting compartment or voting machine booth already occupied by another, except when giving assistance as permitted by this act.

---

[1] The General Assembly's authority to enact legislation governing the conduct of federal elections comes directly from the United States Constitution.  U.S. CONST., ART. I, § 4; U.S. CONST., ART. II, § 1; *Project Vote v. Kelly*, 805 F.Supp.2d 152, 174-175 (W.D.Pa. 2011).

(b) No elector, except an election officer, clerk, machine operator or overseer, shall be allowed to re-enter the enclosed space after he has once left it, except to give assistance as provided by this act.

(c) No person, when within the polling place, shall electioneer or solicit votes for any political party, political body or candidate, nor shall any written or printed matter be posted up within the said room, except as required by this act.

(d) All persons, except election officers, clerks, machine inspectors, overseers, watchers, persons in the course of voting, persons lawfully giving assistance to voters, and peace and police officers, when permitted by the provisions of this act, must remain at least ten (10) feet distant from the polling place during the progress of the voting.

(e) When the hour for closing the polls shall arrive, all qualified electors who have already qualified, and are inside the enclosed space, shall be permitted to vote; and, in addition thereto, all those qualified electors who are in the polling place outside the enclosed space waiting to vote and all those voters who are in line either inside or outside of the polling place waiting to vote, shall be permitted to do so, if found qualified.

(f) It shall be the duty of the judge of election to secure the observance of the provision of this section, to keep order in the voting room, and to see that no more persons are admitted within the enclosed space than are permitted by this act. The judge of election may call upon any constable, deputy constable, police officer or other peace officer to aid him in the performance of his duties under this section.

25 PA. STAT. § 3060. These statutory provisions are designed to promote "the free exercise of the right of suffrage" enjoyed by qualified voters throughout Pennsylvania. PA. CONST., ART. I, § 5.

General elections to fill federal, state and local offices are held on the Tuesday following the first Monday in November. 2 U.S.C. §§ 1, 7; 3 U.S.C. § 1; 25 PA. STAT. §§ 2751-2752. Four years ago, the general election was conducted on November 4, 2008. An attorney for PG contacted the Division Manager in October 2008 and inquired about the restrictions that the Elections Division would impose on *Post-Gazette* reporters covering the election at polling places throughout Allegheny County. Docket No. 31-1 at 11. In a letter to PG's counsel dated October 28, 2008, an attorney employed by Allegheny County's Department of Law stated as follows:

> This letter is to confirm our telephone conversation of last week where I indicated that Allegheny County's policy is to prohibit photographs, video taping and any other type of recording inside the polling place. That prohibition extends to attempts to record activity in the polling place from outside of the polling place, for example, through an open door or window.
>
> The Pennsylvania Constitution at Article VII, Section 4 mandates secrecy in voting. That provision, combined with the applicable provisions of the Pennsylvania Election Code limiting persons properly inside the polling place, prohibits any recording or attempt to record activity inside the polling place.
>
> That prohibition does not, though, extend to outside the polling place. There seems to be no restriction on recording outside the polling place.

*Id.* at 12. By prohibiting attempts to photograph or record activities within polling places through open doors and windows, the Elections Division's policy was more restrictive than § 3060(d). 25 PA. STAT. § 3060(d).

PG commenced an action against Allegheny County and the Allegheny County Board of Elections ("Board")[2] in the Court of Common Pleas of Allegheny County on October 31, 2008, alleging that the policy promulgated by the Elections Division was violative of the First and Fourteenth Amendments to the United States Constitution and Article I, § 7, of the Pennsylvania Constitution. Docket No. 31-1 at 2-10. The complaint filed by PG alleged that, during previous elections, Allegheny County officials had "attempted to prevent news photographers who were located in places lawfully accessible to them from photographing in the direction of voting machines." *Id.* at 5, ¶ 7. It was further alleged that counties surrounding Allegheny County had not imposed similar restrictions on members of the media. *Id.*

PG sought a preliminary injunction prohibiting Allegheny County officials from enforcing the policy. Docket No. 31-2 at 4. Attached to its motion was a proposed order reading as follows:

---

[2] Pennsylvania law requires each county to have a "county board of elections" responsible for exercising "jurisdiction over the conduct of primaries and elections in such county." 25 PA. STAT. § 2641(a).

AND NOW, to wit, this _____ day of November, 2008, upon
consideration of Plaintiff's Motion for Preliminary Injunction and Complaint;

AND upon having determined that Plaintiff will suffer immediate and
irreparable injury as a result of Defendants' conduct, it is hereby ORDERED,
ADJUDGED and DECREED that Plaintiff's Motion be and hereby is
GRANTED.

Defendants and their agents are hereby prohibited from restricting or
interfering with attempts of Plaintiff's agents and employees to photograph
activities in and around polling places so long as Plaintiff's agents and employees
are located in areas accessible to the public or into which they have otherwise
been lawfully admitted.

*Id.* at 5.  Judge Joseph James signed and dated the proposed order on November 3, 2008.  Docket

No. 31-4 at 2-3.  At the end of the order, however, Judge James added the following sentence:

No photography shall be taken from inside the polling place or within ten (10)
feet of the entrance of the polling place.

*Id.* at 2.  This sentence was apparently added to clarify that Allegheny County officials were not

prohibited from enforcing § 3060(d).  25 PA. STAT. § 3060(d).

Elections for federal offices are governed by the Help America Vote Act of 2002

("HAVA") [42 U.S.C. § 15301 *et seq.*].  Under § 302(a) of the HAVA, an individual who

declares himself or herself to be an eligible voter in a given jurisdiction is entitled to "cast a

provisional ballot" in the event that his or her name "does not appear on the official list of

eligible voters for the [relevant] polling place," or if "an election official asserts that [he or she]

is not eligible to vote."  Pub. L. No. 107-252, § 302(a); 116 Stat. 1666, 1706-1707 (2002); 42

U.S.C. § 15482(a).  A vote appearing on a provisional ballot is counted only if an election

official later verifies the individual's eligibility to vote under state law.  42 U.S.C. § 15482(a)(4).

Pennsylvania's General Assembly recently enacted "Act 18," which revised the statutory provisions governing the conduct of elections.[3] 2012 Pa. Laws 18. The revisions became effective on March 14, 2012, when Act 18 was signed into law by Governor Tom Corbett. *Id.*, § 12. Section 3 of Act 18 requires an individual to provide a "proof of identification" before voting. *Id.*, § 3; 25 PA. STAT. § 3050(a). An individual who is unable to satisfy this requirement may cast only a provisional ballot.[4] 25 PA. STAT. § 3050(a.2), (a.4).

On June 19, 2012, PG filed a motion to amend with the Court of Common Pleas, seeking changes to Judge James' order of November 3, 2008. Docket No. 31-5 at 2-9. PG requested that the following language be added to the order:

> Starting with the November 6, 2012, Pennsylvania general election and continuing with all primary and general elections thereafter, The Post-Gazette's agents and employees are permitted to photograph and film (collectively "record") members of the electorate in the polling place as they register with the election officials, but are not permitted to record the electorate in the voting booths while they vote. Further, upon objection by any member of the electorate, The Post-Gazette's agent or employee shall cease recording the objector immediately.

*Id.* at 29. In support of its position, PG argued that reporters working for the *Post-Gazette* were constitutionally entitled to observe and cover the implementation and enforcement of Act 18. *Id.* at 6-8, ¶¶ 9-16. PG also maintained that newspaper reporters working in other Pennsylvania counties had been permitted to take photographs of voters inside of polling places. *Id.* at 5-6, ¶¶ 4-8. A hearing before Judge James was scheduled for July 17, 2012. *Id.* at 30.

---

[3] Pennsylvania's election laws apply with equal force to federal and state elections. *Kuznik v. Westmoreland County Board of Elections*, 902 A.2d 476, 490-493 (Pa. 2006).

[4] Section 10 of Act 18 provides that an "otherwise qualified" voter who "does not provide proof of identification" while seeking to vote in an election occurring prior to September 17, 2012, "may cast a ballot that shall be counted without the necessity of presenting proof of identification and without the necessity of casting a provisional ballot." 2012 Pa. Laws 18, § 10(1)(ii). On October 2, 2012, the Pennsylvania Commonwealth Court issued a preliminary injunction extending the application of § 10 "beyond September 17, 2012, and through the general election of November 6, 2012." *Applewhite v. Commonwealth of Pennsylvania*, 2012 WL 4497211, at *8 (Pa.Commw.Ct. Oct. 2, 2012). Litigation surrounding the implementation and enforcement of Act 18 is ongoing. That litigation has no bearing on the legal issues presented in this case.

PG commenced this action against the Secretary, the Division Manager and the Board on July 11, 2012, alleging that § 3060(d) could not be constitutionally applied to members of the media. Docket No. 1 at ¶¶ 1, 18, 22-29. The complaint filed by PG contained claims under 42 U.S.C. § 1983 for alleged violations of the First and Fourteenth Amendments. *Id.* at ¶¶ 21-35. The First Amendment claims were based on a contention that the continued enforcement of § 3060(d) in Allegheny County would interfere with the ability of *Post-Gazette* reporters to observe and cover the interactions between voters and election officials on Election Day. *Id.* at ¶¶ 17-29. PG also averred that the Defendants had violated its rights under the Equal Protection Clause by denying *Post-Gazette* reporters access to polling places while permitting reporters from other newspapers to photograph individuals in the act of voting. *Id.* at ¶¶ 14-15, 31-32, 34. Immediately after commencing this action, PG filed a praecipe to discontinue the proceedings in the Court of Common Pleas. Docket No. 31-6 at 2-4.

On July 31, 2012, the Secretary moved for the dismissal of PG's complaint. Docket No. 21. The Board and the Division Manager filed a separate motion to dismiss later that day. Docket No. 23. Efforts to resolve the case through the Court's alternative dispute resolution ("ADR") program were unsuccessful. Docket No. 29. PG filed an amended complaint on August 13, 2012, adding new factual allegations to support its claims under the Equal Protection Clause. Docket No. 28 at ¶¶ 14-18, 34-36, 38-39. The filing of the amended complaint effectively mooted the Defendants' earlier motions to dismiss. *Brickell v. Clinton County Prison Board*, 658 F.Supp.2d 621, 623 (M.D.Pa. 2009). The Defendants filed new motions to dismiss on August 21, 2012. Docket Nos. 30 & 32. The parties advanced their respective positions during an oral argument session conducted on September 7, 2012. Docket No. 41.

The County Executive, who serves as the Chairman of the Board, conducted a news conference on September 11, 2012. Docket No. 43 at ¶ 1. The next morning, the website of the *Post-Gazette* posted an article about the news conference authored by Timothy McNulty ("McNulty"). Docket No. 43-1. The pertinent part of the article stated as follows:

> Allegheny County Executive Rich Fitzgerald said he wants the news media allowed into polling places on Election Day and was "totally blindsided" by a lawsuit the Pittsburgh Post-Gazette filed in federal court on the matter.
>
> Mr. Fitzgerald opposes the state's new voter identification requirements and said he reached an agreement with the newspaper to not oppose its legal efforts to open up polling places to cameras on Nov. 6. So he was shocked when the Post-Gazette sought that access by suing the state and county in federal court July 11.
>
> "If there is any type of voter ID challenge on election day—and we anticipate there will be many throughout our county and probably throughout the country—we think the disinfection of sunlight being there is going to be healthy for democracy," he said at a Tuesday news conference on the suit.
>
> "So we agree with the Post-Gazette and have agreed with them all along. So it was very surprising to us, when we were telling them that we support their position, and we're going to go to court to support their position, that their lawyer—who should have known better—decided to file suit against a position that we don't hold."

*Id.* at 1. A later part of the article attributed comments to PG's counsel suggesting that Allegheny County had refused to agree to a consent order permitting media access to polling places on Election Day, leaving open the possibility that the Court of Common Pleas would deny relief on the basis of an "unconstitutional statute." *Id.* The article was published on Page B2 of the September 12, 2012, edition of the *Post-Gazette*. Timothy McNulty, *Fitzgerald criticizes Post-Gazette over lawsuit on polling place access*, PITTSBURGH POST-GAZETTE, September 12, 2012, at B2.

On September 20, 2012, PG moved to strike portions of the brief filed by the Secretary in support of her motion to dismiss. Docket No. 42. PG also asked the Court to take judicial notice

of the statements attributed to the County Executive in McNulty's article. Docket No. 43. In addition, PG sought leave to file a supplemental brief discussing the importance of the County Executive's comments. Docket No. 44. The Secretary filed responses to those motions on September 26, 2012. Docket Nos. 48, 50 & 51.

PG, the Division Manager and the Board jointly moved for the entry of a consent order on September 27, 2012. Docket No. 52. The terms of the proposed order purported to enjoin the Board from denying "representatives of the media" access to polling places in Allegheny County for the purpose of taking "photographs and moving pictures" of voters during the "sign-in process." Docket No. 52-1 at 1-2. The term "sign-in process" was used to describe the implementation and enforcement of Act 18's "identification" requirement. *Id.* The proposed agreement also included a term requiring the Board to "notify and advise" the judges of election serving throughout Allegheny County of the right of media representatives to enter polling places on Election Day. *Id.* at 2. In exchange for those concessions, PG offered to withdraw its claims for money damages, its claims arising under the Equal Protection Clause, and its request for declaratory relief concerning the constitutionality of § 3060(d). *Id.* Although the Secretary declined to consent to the proposed agreement, its execution was conditioned on the discontinuance of PG's claims against her. Docket No. 52 at 2, ¶ 3.

An expedited judicial conference was held on the morning of September 28, 2012, to address this motion and the proposed order. Docket No. 54. Counsel for PG provided the Court with the background and basis of the motion and order to which counsel for the Board and Division Manager agreed. The Secretary, however, objected. Given same, the Court ordered oral argument on October 1, 2012. During the course of same, PG, the Division Manager and the Board revised their proposed order and submitted it for consideration. The revised proposal

included a term requiring media representatives to stop recording a voter upon hearing his or her objection. Docket No. 56 at 2. The Secretary continued to object to the entry of a consent decree in this case. Docket No. 57. The Court granted an oral motion made by PG to delay a ruling in this matter until October 5, 2012. *Id.* No further filings were made as of the close of business on the fifth. The Court will now proceed to address all seven motions presently before the Court. Docket Nos. 30, 32, 42, 43, 44, 52 & 58.

## III.    <u>The Nondispositive Motions Filed by PG</u>

PG asks the Court to strike portions of the brief filed by the Secretary in support of her motion to dismiss. Docket No. 42. The motion to strike has been filed pursuant to Federal Rule of Civil Procedure 12(f), which permits a federal court to "strike *from a pleading* an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f)(emphasis added). A brief filed by a party does not constitute a "pleading" within the meaning of Rule 12(f). FED. R. CIV. P. (7)(a)(1)-(7). PG's motion to strike will be denied on that basis. *Hrubec v. National Railroad Passenger Corp.*, 829 F.Supp. 1502, 1506 (N.D.Ill. 1993). The arguments advanced in support of PG's motion to strike are more properly regarded as advocacy in opposition to the Secretary's motion to dismiss. *Essex Insurance Co. v. Foley*, 827 F.Supp.2d 1326, 1327, n. 1 (S.D.Ala. 2011).

Federal Rule of Evidence 201 permits a federal court to "judicially notice" an "adjudicative fact" that "is not subject to reasonable dispute" because it "is generally known within the trial court's territorial jurisdiction," or because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(a), (b)(1)-(2). A federal court may take judicial notice of a newspaper article's *existence*. *Selkridge v. United of Omaha Life Insurance Co.*, 360 F.3d 155, 162, n. 5 (3d Cir. 2004). PG

asks the Court to take judicial notice of the *statements* reportedly made by the County Executive during his news conference. Docket No. 43 at 1-2, ¶¶ 1-6. There is an obvious difference between accepting the *fact* of an article's existence and accepting the *truth* of the statements contained therein. Reports made by members of the press are frequently disputed. *Montgomery County v. Microvote Corp.*, 320 F.3d 440, 444, n. 2 (3d Cir. 2003). The Court has no reason to question the accuracy of McNulty's reporting. Nevertheless, a decision to take judicial notice of the comments allegedly made by the County Executive would entail the acceptance not only of the article's *contents*, but also of its *truth*.

Under these circumstances, there is no need for the Court to consider whether the existence of the article provides an adequate basis for taking judicial notice of what the County Executive actually said during the news conference. The statements attributed to the County Executive are irrelevant to the issues in this case. *Cavert Acquisition Co. v. National Labor Relations Board*, 83 F.3d 598, 609-610 (3d Cir. 1996)(declining to take judicial notice of facts deemed to be irrelevant). In certain instances, statements made by public officials may have some bearing on how a legal dispute should be resolved. *Arizona v. United States*, ___U.S.___, ___, 132 S.Ct. 2492, 2520-2521, 183 L.Ed.2d 351 (2012)(Scalia, J., concurring in part and dissenting in part). This is not one of those instances.

PG contends that the application of § 3060(d) to members of the press is forbidden by the First and Fourteenth Amendments. Docket No. 28 at ¶¶ 24-40. The applicable provisions of the Constitution are self-executing. *City of Boerne v. Flores*, 521 U.S. 507, 524, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). The Constitution can be *changed* only in accordance with Article V. U.S. CONST., ART. V; *Clinton v. City of New York*, 524 U.S. 417, 449, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998). "The power to *interpret* the Constitution in a case or controversy remains in the

Judiciary." *Flores*, 521 U.S. at 524 (emphasis added). Nothing said by the County Executive about the *desirability* of providing newspaper reporters with access to polling places can affect the *constitutionality* of § 3060(d)'s enforcement. Hence, there is no need for the Court to take judicial notice of his statements. *Cavert Acquisition Co.*, 83 F.3d at 609-610. PG's motion for the taking of judicial notice will be denied. Docket No. 43.

The parties have submitted several briefs in support of their respective positions. They have also been afforded opportunities to advance their positions during oral argument sessions relating to the motions to dismiss and the proposed consent decree. Due to the time-sensitive nature of the present controversy, the Court has gone to great lengths to resolve this matter on an expedited basis. Election Day is only four weeks away. Further delays could seriously compromise the ability of the parties to seek appellate review of today's decision before the election. Therefore, PG's request for leave to file a supplemental brief will also be denied. Docket No. 44.

## IV.   <u>Standards of Review</u>

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges a court's subject-matter jurisdiction over the plaintiff's claims. FED. R. CIV. P. 12(b)(1). "At issue in a Rule 12(b)(1) motion is the court's 'very power to hear the case.'" *Judkins v. HT Window Fashions Corp.*, 514 F.Supp.2d 753, 759 (W.D.Pa. 2007), quoting *Mortensen v. First Federal Savings & Loan Association*, 549 F.2d 884, 891 (3d Cir. 1977). As the party asserting that jurisdiction exists, the plaintiff bears the burden of showing that his or her claims are properly before the court. *Development Finance Corp. v. Alpha Housing & Health Care*, 54 F.3d 156, 158 (3d Cir. 1995). In reviewing a Rule 12(b)(1) motion, a court must determine whether the attack on its jurisdiction is a facial attack or a factual attack. A facial attack

challenges the sufficiency of the plaintiff's pleadings on jurisdictional grounds. *Petruska v. Gannon University*, 462 F.3d 294, 302, n. 3 (3d Cir. 2006). When considering a facial attack, a court must accept the allegations contained in the plaintiff's complaint as true. *Id.* A factual attack on the court's jurisdiction must be treated differently. *Id.* When considering a factual attack, the court does not attach a presumption of truthfulness to the plaintiff's allegations, and the existence of disputed material facts does not preclude the court from deciding for itself whether jurisdiction over the plaintiff's claims can be properly exercised. *Mortensen*, 549 F.2d at 891.

In light of the United States Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), a complaint may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008), quoting *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). This standard requires more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. The complaint must allege a sufficient number of facts "to raise a right to relief above the speculative level." *Id.* This requirement is designed to facilitate the notice-pleading standard of Federal Rule of Civil Procedure 8(a)(2), which requires "a short and plain statement of [a] claim *showing* that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2)(emphasis added).

In considering a motion to dismiss filed pursuant to Rule 12(b)(6), a court accepts all of the plaintiff's allegations as true and views all reasonable inferences drawn from those

allegations in the light most favorable to the plaintiff. *Buck v. Hampton Township School District*, 452 F.3d 256, 260 (3d Cir. 2006). Nonetheless, a court need not credit bald assertions, unwarranted inferences, or legal conclusions cast in the form of factual averments. *Morse v. Lower Merion School District*, 132 F.3d 902, 906, n. 8 (3d Cir. 1997). The primary question in deciding a motion to dismiss is not whether the plaintiff will ultimately prevail, but rather whether he or she is entitled to offer evidence to establish the facts alleged in the complaint. *Maio v. Aetna*, 221 F.3d 472, 482 (3d Cir. 2000). The purpose of a motion to dismiss is to "streamline[] litigation by dispensing with needless discovery and factfinding." *Neitzke v. Williams*, 490 U.S. 319, 326-327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). In addition to the allegations contained in the complaint, a court may consider matters of public record, exhibits attached to the complaint, and other items appearing in the record of the case. *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384, n. 2 (3d Cir. 1994).

## V.     The Motions to Dismiss

The Defendants[5] challenge the Court's subject-matter jurisdiction to entertain this action. Docket No. 30 at ¶ 2; Docket No. 32 at ¶¶ 1-7. They alternatively contend that the claims asserted in the amended complaint are precluded by the earlier decision rendered by the Court of Common Pleas. Docket No. 31 at 9, n. 8; Docket No. 40 at 1-7. The Secretary argues that the Eleventh Amendment immunizes her from any claims for money damages brought by PG. Docket No. 31 at 10-11. The Defendants also maintain that PG fails to allege actionable violations of the Constitution. Docket No. 30 at ¶ 3; Docket No. 32 at ¶¶ 8-15. These issues will be addressed in sequential order.

### A.     The *Rooker-Feldman* Doctrine

---

[5] The Court refers to the Defendants collectively due to the pendency of the motion to dismiss filed by the Division Manager and the Board. Docket No. 32. It is acknowledged that the Division Manager and the Board would prefer to have this litigation terminated through the entry of a consent decree. Docket Nos. 52 & 58.

Congress has provided United States "district courts" with "original jurisdiction" over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Since this jurisdiction is "original" in nature, federal district courts are "precluded from exercising appellate jurisdiction over final state-court judgments." *Lance v. Dennis*, 546 U.S. 459, 463, 126 S.Ct. 1198, 163 L.Ed.2d 1059 (2006)(*per curiam*). The Supreme Court's jurisdiction to review decisions rendered by state tribunals is governed by 28 U.S.C. § 1257, which provides:

> **§ 1257.  State courts; certiorari**
> **(a)** Final judgments or decrees rendered by the highest court of a State in which a decision could be had, may be reviewed by the Supreme Court by writ of certiorari where the validity of a treaty or statute of the United States is drawn in question or where the validity of a statute of any State is drawn in question on the ground of its being repugnant to the Constitution, treaties, or laws of the United States, or where any title, right, privilege, or immunity is specially set up or claimed under the Constitution or the treaties or statutes of, or any commission held or authority exercised under, the United States.
> **(b)** For the purposes of this section, the term "highest court of a State" includes the District of Columbia Court of Appeals.

28 U.S.C. § 1257. In *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416, 44 S.Ct. 149, 68 L.Ed. 362 (1923), a statutory predecessor to § 1257(a) was construed to vest *exclusive* jurisdiction in the Supreme Court to review decisions issued by state courts. The rule established in *Rooker* was reaffirmed in *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). In *Feldman*, the Supreme Court declared that federal district courts did not have jurisdiction to entertain "challenges to state-court decisions in particular cases *arising out of judicial proceedings*." *Feldman*, 460 U.S. at 486 (emphasis added).

The decisions in *Rooker* and *Feldman* gave rise to the so-called "*Rooker-Feldman* doctrine." *Lampe v. Lampe*, 665 F.3d 506, 518, n. 15 (3d Cir. 2011). Prior to the Supreme Court's decision in *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 283, 125

S.Ct. 1517, 161 L.Ed.2d 454 (2005), some federal courts erroneously construed the doctrine "to extend far beyond the contours of the *Rooker* and *Feldman* cases."  In *Exxon Mobil*, the Supreme Court narrowed the reach of the doctrine by stating as follows:

> The *Rooker-Feldman* doctrine, we hold today, is confined to cases of the kind from which the doctrine acquired its name: cases brought by *state-court losers* complaining of injuries *caused by state-court judgments* rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.  *Rooker-Feldman* does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions.

*Exxon Mobil*, 544 U.S. at 284 (emphasis added).  The Defendants assert that the instant action constitutes an impermissible attempt by PG to have this Court redress injuries *caused by* the order entered by the Court of Common Pleas on November 3, 3008.  Docket No. 31 at 7-9.

The record does not clearly establish PG's status as a "state-court loser."  *Exxon Mobil*, 544 U.S. at 284.  The action in the Court of Common Pleas was commenced after PG had been informed of the Elections Division's policy prohibiting the recording of polling activities through open doors and windows.  Docket No. 31-1 at 6, ¶ 9.  The complaint in equity filed by PG was accompanied by an affidavit signed by Larry Roberts ("Roberts"), who was serving as the *Post-Gazette*'s Assistant Managing Editor for Photography.  Docket No. 31-1 at 10.  In his affidavit, Roberts claimed that photographers working for the *Post-Gazette* had been denied permission "to photograph *from public areas* in the direction of the voting machines."  *Id.* at 10, ¶ 3 (emphasis added).  In its brief requesting the issuance of a preliminary injunction, PG stated as follows:

> Plaintiff undoubtedly has a right to gather the news *from areas readily accessible to the public*.  Defendants seek to impermissibly deprive Plaintiff of that right under color of 25 P.S. § 3060(d) (which states that all non-voters must remain at least ten feet away from the polling place during the progress of voting) and Article 7, Section 4 of the Pennsylvania Constitution (which states that all elections by the citizens shall be by ballot or by such other method as may be

> prescribed by law provided that secrecy in voting be preserved). On their faces, neither of these provisions authorize the restriction here.

Docket No. 31-3 at 7 (emphasis added). PG moved for an order prohibiting election officials from "restricting or interfering with attempts [by its] agents and employees to photograph activities in and around polling places so long as those agents and employees [we]re located in *areas accessible to the public* or into which they ha[d] otherwise been *lawfully* admitted." Docket No. 31-2 at 4 (emphasis added). Judge James later signed an order containing the language that had been proposed by PG. Docket No. 31-4 at 2-3.

The Defendants maintain that the language in the order prohibiting the taking of photographs from the interior of a polling place, or from areas within ten feet of the entrance to a polling place, constituted a partial *denial* of the relief sought by PG. Docket No. 31 at 8. The inference drawn by the Defendants does not inevitably flow from the language of the order or the context of the case. A photographer standing inside of a polling place, or within ten feet of the entrance to a polling place, would not be located in an area "accessible to the public." Docket No. 31-4 at 2-3. Given the clear mandate of § 3060(d), a photographer cannot be "lawfully admitted" to such an area. 25 PA. STAT. § 3060(d). Consequently, the relief allegedly "denied" by the Court of Common Pleas appears to have been relief that was never sought by PG in the first place. It is worth noting that the order purported to "grant" PG's motion for a preliminary injunction. Docket No. 31-4 at 2-3. The order did not contain language suggesting that the motion was being granted only "in part," or that it was being "denied in part." *Id.* The language relied upon by the Defendants was apparently added only to clarify that the Court of Common Pleas was not ordering election officials to permit conduct that would have contravened § 3060(d).

In the earlier action, PG challenged a policy that was being enforced "under color of" § 3060(d).  Docket No. 31-1 at 7, ¶ 17; Docket No. 31-3 at 7.  Seizing on this language, the Defendants attempt to equate the challenge to the "policy" with a challenge to § 3060(d) itself.  Docket No. 31 at 8.  The language referenced by the parties in their respective filings is contained in § 1983, which creates a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  The Supreme Court has held that a governmental officer can act "under color of" a state statute within the meaning of § 1983 even if his or her actions violate state law.  *Monroe v. Pape*, 365 U.S. 167, 171-187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).  Therefore, it was possible for PG to challenge a policy promulgated and enforced "under color of" § 3060(d) without directly challenging that statutory provision.  PG's attempt to enjoin the enforcement of the Elections Division's "policy" cannot be equated with an attempt to enjoin the enforcement of § 3060(d).  Docket No. 31-3 at 7.

The "policy" challenged by PG four years ago went beyond the requirements of § 3060(d).  Nothing in § 3060(d) explicitly prohibits a photographer from taking pictures of polling activities while standing outside of the ten-foot buffer zone.  The statutory provision only limits the areas in which "persons" other than "election officers, clerks, machine inspectors, overseers, watchers, persons in the course of voting, persons lawfully giving assistance to voters, and peace and police officers" can "remain" "during the progress of the voting."  25 PA. STAT. § 3060(d).  The policy at issue in the case before the Court of Common Pleas allegedly "prevent[ed] news photographers who were located in places *lawfully* accessible to them from

photographing in the direction of voting machines." Docket No. 31-1 at 5, ¶ 7 (emphasis added). The complaint in equity filed by PG sought to vindicate only a "First Amendment right to gather the news *from public places*." *Id.* at 6, ¶ 11 (emphasis added). It referred to the "Pennsylvania Election Code" only in general terms. *Id.* at 7, ¶ 17. PG mentioned § 3060(d) only once in its brief requesting the issuance of a preliminary injunction, and only for the purpose of satisfying § 1983's "under color of" law requirement. Docket No. 31-3 at 7. The documentary record does not support the Defendants' contention that PG sought an order from the Court of Common Pleas enjoining the enforcement of § 3060(d). Since the language of the order giving effect to § 3060(d) cannot be reasonably construed as a partial denial of the relief sought in that action, PG is not a "state-court loser" for purposes of the *Rooker-Feldman* doctrine. *Exxon Mobil*, 544 U.S. at 284.

In *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 166 (3d Cir. 2010), the United States Court of Appeals for the Third Circuit observed that the causation standard applicable under the *Rooker-Feldman* framework requires "an inquiry into the source of [a] plaintiff's injury." In this respect, the applicability of the *Rooker-Feldman* doctrine frequently turns on "whether the injury complained of in federal court existed prior to the state-court proceedings." *Id.* at 167. An injury predating a state-court decision cannot be reasonably said to have been *caused by* that decision. *Hoblock v. Albany County Board of Elections*, 422 F.3d 77, 87-88 (2d Cir. 2005).

Even if it is assumed that PG is a "state-court loser," the injuries complained of in this action were not *caused by* the order entered by the Court of Common Pleas. *Great Western*, 615 F.3d at 166-167. PG's First Amendment claims are based on injuries caused by the application of § 3060(d). Docket No. 28 at ¶¶ 27-32. That statutory prohibition was enacted and enforced

before the issuance of Judge James' order. *Great Western*, 615 F.3d at 167. The claims arising under the Equal Protection Clause are not based on injuries attributable to the order. Indeed, the Defendants make no attempt to establish a causal relationship between the issuance of that order and the selective enforcement of § 3060(d) alleged in the amended complaint. Docket No. 31 at 7-9. The *Rooker-Feldman* doctrine is not implicated when a federal court is "asked to assess the validity of a rule promulgated in a nonjudicial proceeding." *Feldman*, 460 U.S. at 486. Although "a state-court decision is not reviewable by lower federal courts," "a statute or rule governing the decision may be challenged in a federal action." *Skinner v. Switzer*, ___U.S.___, ___, 131 S.Ct. 1289, 1298, 179 L.Ed.2d 233 (2011). Because no causal connection exists between the order entered by the Court of Common Pleas and the injuries complained of in the amended complaint, the instant action is not a "case[] arising out of judicial proceedings." *Feldman*, 460 U.S. at 486.

The prohibitory injunction entered by the Court of Common Pleas was directed at Allegheny County and the Board. Docket No. 31-4 at 2-3. The sentence recognizing the enforceability of § 3060(d) clearly defined the limits of the injunction. *Id.* Although Judge James enjoined the enforcement of the policy challenged by PG, he did not enjoin the enforcement of § 3060(d). *Id.* It is not clear whether the language in the order *permitting* election officials to enforce § 3060(d) was meant to affirmatively *prohibit* employees of PG from violating that statute. The documentary record does not explain whether *Post-Gazette* reporters would be in contempt of the order if they were to locate themselves within § 3060(d)'s ten-foot buffer zone with the permission of a judge of election. That issue, however, has no bearing on the Court's jurisdiction to entertain this action. In *Bolden v. City of Topeka*, 441 F.3d 1129 (10th Cir. 2006), the United States Court of Appeals for the Tenth Circuit explained:

> Appellate review—the type of judicial action barred by *Rooker-Feldman*—consists of a review of the proceedings already conducted by the "lower" tribunal to determine whether it reached its result in accordance with law. When, in contrast, the second court tries a matter anew and reaches a conclusion contrary to a judgment by the first court, without concerning itself with the bona fides of the prior judgment (which may or may not have been a lawful judgment under the evidence and argument presented to the first court), it is not conducting appellate review, regardless of whether compliance with the second judgment would make it impossible to comply with the first judgment.

*Bolden*, 441 F.3d at 1143. The United States Court of Appeals for the Third Circuit appears to have adopted the reasoning employed in *Bolden*. *Great Western*, 615 F.3d at 169. Consequently, this Court has jurisdiction to consider the claims asserted by PG even if an injunction permitting *Post-Gazette* reporters to go within the ten-foot buffer zone on Election Day would authorize conduct prohibited by Judge James' order.

Since the constitutional validity of § 3060(d) was not at issue in the earlier case, the instant action does not invite "review and rejection" of the judgment entered by the Court of Common Pleas. *Exxon Mobil*, 544 U.S. at 284. The constitutional challenge brought by PG "encounters no *Rooker-Feldman* shoal." *Skinner*, 131 S.Ct. at 1297. Given that no jurisdictional defect exists, the claims asserted by PG are "governed by preclusion law." *Exxon Mobil*, 544 U.S. at 293.

## B.     Preclusion

The Full Faith and Credit Clause[6] of the United States Constitution requires the courts of one State to give preclusive effect to the judgments rendered by the courts of another State. *Riley v. New York Trust Co.*, 315 U.S. 343, 348-349, 62 S.Ct. 608, 86 L.Ed. 885 (1942). "A final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter

---

[6] "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State; And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." U.S. CONST., ART. IV, § 1.

and persons governed by the judgment, qualifies for recognition throughout the land" and "gains nationwide force." *Baker v. General Motors Corp.*, 522 U.S. 222, 233, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998). Federal courts are not *constitutionally* required to give preclusive effect to the judgments issued by state tribunals. *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 483, n. 24, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982)(remarking that federal courts are "not included within the constitutional provision"). When a judgment is rendered by a state court, federal courts are *statutorily* required to accord that judgment preclusive effect under 28 U.S.C. § 1738. The applicable statutory language provides that "[t]he Acts of legislature of any State, Territory, or Possession of the United States . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken." 28 U.S.C. § 1738. "This statute has long been understood to encompass the doctrines of *res judicata*, or 'claim preclusion,' and collateral estoppel, or 'issue preclusion.'" *San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323, 336, 125 S.Ct. 2491, 162 L.Ed.2d 315 (2005)(emphasis added). "Claim preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit. Issue preclusion generally refers to the effect of a prior judgment in foreclosing successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, whether or not the issue arises on the same or a different claim." *New Hampshire v. Maine*, 532 U.S. 742, 748-749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). A federal court must give a judgment issued by a state court the same preclusive effect that it would be accorded in the courts of the relevant State. *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 523, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986).

Unlike the *Rooker-Feldman* doctrine, which relates to a federal court's subject-matter jurisdiction, preclusion is an affirmative defense. FED. R. CIV. P. 8(c)(1); *Exxon Mobil*, 544 U.S. at 293; *Great Western*, 615 F.3d at 173. The Secretary raises this defense by arguing that the claims asserted by PG are barred by "substantive principles of preclusion." Docket No. 31 at 9, n. 8; Docket No. 40 at 1. This argument must be considered under the applicable principles of both "claim preclusion" and "issue preclusion."

In *Balent v. City of Wilkes-Barre*, 669 A.2d 309 (Pa. 1995), the Pennsylvania Supreme Court made the following observations about the doctrine of claim preclusion:

> *Res judicata*, or claim preclusion, is a doctrine by which a former adjudication bars a later action on all or part of the claim which was the subject of the first action. Any final, valid judgment on the merits by a court of competent jurisdiction precludes any future suit between the parties or their privies on the same cause of action. *Allen v. McCurry*, 449 U.S. 90, 94, 66 L.Ed.2d 308, 101 S.Ct. 411 (1980). *Res judicata* applies not only to claims actually litigated, but also to claims which could have been litigated during the first proceeding if they were part of the same cause of action. *Id.*

*Balent*, 669 A.2d at 313 (emphasis in original). The judgment presently at issue was entered shortly before the 2008 general election. Docket No. 31-4 at 2-3. PG's claims under the Equal Protection Clause are based primarily on conduct occurring during and after that election. Docket No. 28 at ¶¶ 14-18, 34-36, 38-39. To the extent that those claims are premised on conduct occurring after the entry of Judge James' order, they "could not have been litigated" during the earlier proceeding. *Balent*, 669 A.2d at 313.

The critical question concerning PG's other constitutional claims centers on whether they involve "the same cause of action" as those asserted in the previous case. *Id.* Under Pennsylvania law, "the mere advancement of a different legal theory does not necessarily give rise to a different cause of action." *Turner v. Crawford Square Apartments III, L.P.*, 449 F.3d

542, 549 (3d Cir. 2006).  On the other hand, similarities relating to "one aspect of the relief sought" do not render separate causes of action identical.  *In re Jones & Laughlin Steel Corp.*, 477 A.2d 527, 454 (Pa.Super.Ct. 1984).  It is entirely possible for separate causes of action to arise "out of the same set of factual circumstances."  *McArdle v. Tronetti*, 627 A.2d 1219, 1222 (Pa.Super.Ct. 1993).

An important factor in determining whether two lawsuits are based on the same cause of action is whether the relief sought in the second action is "essentially identical" to the relief sought in the first action.  *Turner*, 449 F.3d at 549, n. 12.  As discussed earlier, the action commenced in the Court of Common Pleas concerned the constitutionality of a county policy governing the *conduct* of reporters and photographers "located in areas accessible to the public."  Docket No. 31-2 at 4; Docket No. 31-4 at 2-3.  The instant action involves a constitutional challenge to a state statute governing the *location* of reporters and photographers on Election Day.  Docket No. 28 at ¶¶ 10, 13, 27, 31.  Although these issues both relate to the ability of *Post-Gazette* employees to cover polling activities, they lack the "identity" necessary for the application of claim preclusion.  *McArdle*, 627 A.2d at 1222-1223.

A party attempting to invoke the defense of issue preclusion must demonstrate that the relevant factual or legal issue was "actually litigated and determined by a valid and final judgment."  *County of Berks ex rel. Baldwin v. Pennsylvania Labor Relations Board*, 678 A.2d 355, 359 (Pa. 1996).  The constitutionality of § 3060(d) was not litigated during the earlier action.  In that case, PG sought only an order protecting its "First Amendment right to gather the news *from public places*."  Docket No. 31-1 at 6, ¶ 11 (emphasis added).  Consequently, the order entered by the Court of Common Pleas does not preclude PG from challenging the validity of § 3060(d) in this Court.

Even if the Defendants could establish the applicability of issue preclusion under these circumstances, a question would remain as to whether this case falls within an exception to the general rule prohibiting the relitigation of legal issues. The *Restatement (Second) of Judgments* recognizes that a legal issue "litigated and determined by a valid and final judgment" may need to be relitigated where "a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws." RESTATEMENT (SECOND) OF JUDGMENTS, § 28(2). Pennsylvania has adopted this portion of the *Restatement*. *Clark v. Troutman*, 502 A.2d 137, 139-141 (Pa. 1985). PG seeks an order permitting its photographers "to record voters as they register with election officials." Docket No. 28 at ¶ 30. The relief sought by PG is tailored to facilitate media coverage of the enforcement and implementation of Act 18. *Id.* at ¶¶ 20-22. The passage of Act 18 arguably constituted a change in the "legal context" of § 3060(d)'s enforcement. *Clark*, 502 A.2d at 139-141. Furthermore, PG's claims under the Equal Protection Clause are grounded in the allegedly "inequitable administration" of § 3060(d). Docket No. 28 at ¶¶ 14-18, 34-36, 38-39. In these respects, the application of preclusion principles to this case would not necessarily result in the dismissal of PG's claims even if the Defendants could show that the constitutionality of § 3060(d) was decided by the Court of Common Pleas. Since the constitutional validity of § 3060(d) was never litigated in the earlier action, the Court has no occasion to consider whether the claims asserted by PG would otherwise fall within an exception to the general rule of preclusion. It suffices to say that the applicability of the general rule cannot be established in the first place.

      **C.**      **Governmental Immunity**

A plaintiff bringing a personal-capacity claim against a governmental official seeks to hold the official personally liable for his or her misconduct. *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). "An award of damages entered against a personal-capacity defendant can be executed only against his or her 'personal assets.'" *Douglas v. Brookville Area School District*, 836 F.Supp.2d 329, 353 (W.D.Pa. 2011), quoting *Graham*, 473 U.S. at 166. A personal-capacity defendant can sometimes invoke "personal immunity defenses" to defeat a plaintiff's claim. *Graham*, 473 U.S. at 166-167. Nonetheless, an individual sued in his or her personal capacity cannot rely on the immunity defenses available to governmental units. *Hafer v. Melo*, 502 U.S. 21, 27-31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

A claim brought against a public official in his or her official capacity is not materially different from a claim brought directly against his or her employing governmental entity. *Douglas*, 836 F.Supp.2d at 353. An award of damages entered against an official-capacity defendant can be executed only against the entity of which he or she is an agent.[7] *Graham*, 473 U.S. at 166. "The only immunities available to a defendant sued in his or her official capacity are those available to the governmental entity itself." *Douglas*, 836 F.Supp.2d at 353. The distinction between personal-capacity claims and official-capacity claims turns on the capacity in which a defendant is *sued*. *Hafer*, 502 U.S. at 27. It does not turn on the capacity in which he or she has *acted*. *Id.* at 27-31. A public official may be held *personally* liable for his or her *official* acts. *Douglas*, 836 F.Supp.2d at 353.

At oral argument, counsel for PG clarified that only official-capacity claims are being asserted against the Secretary and the Division Manager. Docket No. 41 at 148. Therefore, the Commonwealth and the Elections Division are "the real part[ies] in interest." *Hafer*, 502 U.S. at

---

[7] When a defendant sued in his or her official capacity leaves office, his or her successor becomes the new official-capacity defendant by operation of law. FED. R. CIV. P. 25(d); *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

25.  In this context, the Secretary and the Division Manager can invoke only the "forms of sovereign immunity" available to those entities.  *Graham*, 473 U.S. at 167.

The Eleventh Amendment to the United States Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST., AMEND. XI.  Although its precise language does not preclude a federal court from exercising jurisdiction over an action brought by an individual against the State of which he or she is a citizen, the Eleventh Amendment has been construed "to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms."  *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991).  "This presupposition is based on the understanding that 'the States entered the federal system with their sovereignty intact,' that '[t]he Judicial power of the United States' is limited by this sovereignty, and that a State will not be subjected to suits in federal court brought by private individuals unless it has consented to such suits either expressly or in the 'plan of the convention.'"  *Burns v. Alexander*, 776 F.Supp.2d 57, 72 (W.D.Pa. 2011), quoting *Blatchford*, 501 U.S. at 779.  The States' act of ratifying the Constitution did not constitute a waiver of their immunity from suits brought by private individuals.  *Sossamon v. Texas*, ___U.S.___, ___, 131 S.Ct. 1651, 1657-1658, 179 L.Ed.2d 700 (2011).  Pennsylvania has expressly declined to waive its sovereign immunity.  42 PA. CONS. STAT. § 8521(b).

Congress has the constitutional authority to "enforce" the substantive provisions of the Fourteenth Amendment.  U.S. CONST., AMEND. XIV, § 5.  The United States Supreme Court has held that "Congress may, in determining what is 'appropriate legislation' for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or

state officials which are constitutionally impermissible in other contexts." *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666 (1976)(footnote omitted). If it wishes to abrogate the States' immunity from suit, Congress must make its intention "unmistakably clear in the language of the statute" authorizing the types of civil actions in question. *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). The "general language" of § 1983 has not been construed to abrogate the States' Eleventh Amendment immunity. *Quern v. Jordan*, 440 U.S. 332, 342-345, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). In the same vein, the Supreme Court has held that a State is not a "person" amenable to private suits for money damages under § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 62-71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). This rule applies with equal force to claims brought against state officials in their official capacities. *Id.* at 71.

As a general matter, the nature of the relief sought by a private litigant has no bearing on whether his or her action is barred by the Eleventh Amendment. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 58, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Nevertheless, this general principle has been qualified by the "fiction" that "when a federal court commands a state official to do nothing more than refrain from violating federal law, [the official] is not the State for sovereign-immunity purposes." *Virginia Office for Protection & Advocacy v. Stewart*, ___U.S.___, ___, 131 S.Ct. 1632, 1638, 179 L.Ed.2d 675 (2011). In *Ex Parte Young*, 209 U.S. 123, 159-160, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court recognized the authority of a federal court to enjoin a state official's enforcement of an unconstitutional statute. Speaking through Justice Peckham, the Supreme Court declared:

> The act to be enforced is alleged to be unconstitutional, and if it be so, the use of the name of the State to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity. It is simply an illegal

act upon the part of a state official in attempting by the use of the name of the State to enforce a legislative enactment which is void because unconstitutional. If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States.

*Young*, 209 U.S. at 159-160. Pursuant to the reasoning employed in *Young*, "an official-capacity action brought against a state official by a plaintiff seeking prospective relief is not treated as an action against the State." *Burns*, 776 F.Supp.2d at 73. Moreover, a state official sued in his or her official capacity for prospective relief is a "person" amenable to suit under § 1983. *Will*, 491 U.S. at 71, n. 10.

The foregoing principles govern the claims asserted against the Secretary in this case. PG's attempt to recover money damages from the Secretary is, "in all respects other than name," an attempt to recover money damages from the Commonwealth. *Graham*, 473 U.S. at 166. To the extent that PG seeks monetary relief, the Court has no jurisdiction to entertain its claims against the Secretary. *Sossamon*, 131 S.Ct. at 1657-1658. Even in the absence of a jurisdictional defect, the claims for money damages would nevertheless fail for the independent reason that the Secretary, when sued in her official capacity, is not a "person" subject to liability under § 1983. *Will*, 491 U.S. at 71. PG's claims against the Secretary are not barred by the Eleventh Amendment to the extent that they seek prospective relief. *Burns*, 776 F.Supp.2d at 73. In accordance with the "fiction" embraced in *Young*, the Secretary "is not the State for sovereign-immunity purposes" when she is ordered "to do nothing more than refrain from violating federal law." *Stewart*, 131 S.Ct. at 1638. Instead, she is a "person" amenable to suit for injunctive

relief. *Will*, 491 U.S. at 71, n. 10. Accordingly, the Secretary enjoys no immunity from PG's request that she be enjoined from enforcing § 3060(d).

Unlike the Commonwealth, Allegheny County is not entitled to Eleventh Amendment immunity. *Board of Trustees v. Garrett*, 531 U.S. 356, 369, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001)(observing that "the Eleventh Amendment does not extend its immunity to units of local government"). In *Monell v. Dept. of Social Services*, 436 U.S. 658, 687-691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that local governments are "persons" amenable to private suits for money damages brought under § 1983. Consequently, PG can seek monetary, declaratory[8] and injunctive relief against the Division Manager in his official capacity. *Monell*, 436 U.S. at 690-691. A municipal entity "may not assert the good faith of its officers or agents as a defense to liability under § 1983." *Owen v. City of Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Since the Division Manager has been sued only in his *official* capacity, he cannot avail himself of the defenses available to personal-capacity defendants. *Hafer*, 502 U.S. at 25; *Graham*, 473 U.S. at 167; *McKivitz v. Township of Stowe*, 769 F.Supp.2d 803, 818-819 (W.D.Pa. 2010).

The plain language of § 3060(f) designates "the judge of election" as the individual responsible for "secur[ing] the observance of" § 3060(d)'s requirements in a particular polling place. 25 PA. STAT. § 3060(f). The Secretary contends that she plays no role in the enforcement of § 3060(d), and that she is not a proper defendant in this action. Docket No. 31 at 11-13. PG takes issue with that contention by arguing that each defendant named in the amended complaint is charged with the duty of administering elections in Pennsylvania. Docket No. 36 at 33-34;

---

[8] The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

Docket No. 41 at 84-85. There is no need for the Court to consider whether PG has sued the proper defendants, or whether the relief requested in the amended complaint could be pursued only against a judge of election. In order to secure relief against *any* defendant, PG must establish a constitutional violation that is actionable under § 1983. *Rodriguez v. City of Passaic*, 730 F.Supp. 1314, 1321 (D.N.J. 1990). For the reasons that follow, the allegations contained in the amended complaint do not establish a violation of PG's constitutional rights.

### D. The General Assembly's Authority to Enact § 3060(d)

As noted earlier, the Pennsylvania Constitution gives the General Assembly the power to regulate elections and requires that "secrecy in voting be preserved." PA. CONST., ART. VII, §§ 4, 6. The Commonwealth's interest in preserving "secrecy in voting" clearly has some bearing on the issues in this case. Nevertheless, the regulatory interests at stake cannot be viewed solely through the prism of the Pennsylvania Constitution. The General Assembly's regulatory authority is exercised pursuant to the Pennsylvania Constitution only with respect to elections held to select *state* officeholders. The authority to regulate *state* elections is among the powers "reserved to the States" under the Tenth Amendment. U.S. CONST., AMEND. X; *Oregon v. Mitchell*, 400 U.S. 112, 124-126, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970)(opinion of Black, J.). The provisions of Pennsylvania's Election Code apply equally to federal and state elections. *Kuznik v. Westmoreland County Board of Elections*, 902 A.2d 476, 490-493 (Pa. 2006). As this Court explained in *Project Vote v. Kelly*, 805 F.Supp.2d 152, 174 (W.D.Pa. 2011), a State's authority to regulate *federal* elections "springs directly from the United States Constitution."

Members of Congress are chosen in popular elections. U.S. CONST., ART. I, § 2; U.S. CONST., AMEND. XVII. The Elections Clause of the Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in

each State by the Legislature thereof," subject to the power of Congress to "make or alter such Regulations." U.S. CONST., ART. I, § 4. The Supreme Court has described the Elections Clause as a "default provision" giving the States the power to regulate "the mechanics of congressional elections" to the extent that "Congress declines to pre-empt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997). Since § 3060(d) applies to "Elections for Senators and Representatives," it constitutes an exercise of the General Assembly's authority under the Elections Clause. *Cook v. Gralike*, 531 U.S. 510, 522-523, 121 S.Ct. 1029, 149 L.Ed.2d 44 (2001); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995).

Article II, § 1, of the Constitution provides each State with the power to "appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress."[9] U.S. CONST., ART. II, § 1. The electors appointed pursuant to this authority elect the President and Vice-President of the United States in accordance with the procedures established by the Twelfth Amendment. U.S. CONST., AMEND. XII. The General Assembly's power to prescribe the manner in which Pennsylvania's Presidential electors will be appointed is plenary. *Bush v. Gore*, 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000)(*per curiam*). Because "[t]his power is conferred upon the legislatures of the States by the Constitution of the United States," it "cannot be taken from them *or modified by* their State constitutions." *McPherson v. Blacker*, 146 U.S. 1, 35, 13 S.Ct. 3, 36 L.Ed. 869 (1892)(emphasis added), quoting S. Rep. No. 395, 43d Cong., 1st Sess. Pennsylvania law provides for the popular election of Presidential electors. 25 PA. STAT. §§ 2963, 3191. As applied to elections for Presidential electors, § 3060(d) constitutes an

---

[9] The District of Columbia is entitled to appoint Presidential electors pursuant to the Twenty-third Amendment. U.S. CONST., AMEND. XXIII.

exercise of the General Assembly's authority to direct the manner in which those electors will be appointed. *Bush v. Palm Beach County Canvassing Board*, 531 U.S. 70, 76, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000)(*per curiam*). That authority is not circumscribed by the Pennsylvania Constitution. *Id.* at 76-78; *McPherson*, 146 U.S. at 34-35.

"[T]he States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates."[10] *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). Such regulations are necessary "if some sort of order, rather than chaos, is to accompany the democratic process." *Id.* Regardless of whether a State's regulatory authority is exercised pursuant to its own constitution or the United States Constitution, its legislative enactments are subject to federal constitutional constraints. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008). A State's electoral regulations cannot transgress the limits imposed by the First and Fourteenth Amendments. *Eu v. San Francisco County Democratic Central Committee*, 489 U.S. 214, 222, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989).

### E.      The First Amendment Challenge to § 3060(d)

PG challenges the application of § 3060(d) to members of the media. Docket No. 28 at ¶¶ 25-32. The First Amendment to the United States Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

---

[10] Since the qualifications for service in Congress are set forth in the Constitution, a State has no authority to define one's eligibility to serve as a Senator or Representative. U.S. CONST., ART. I, §§ 2, 3; *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 798-827, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995).

U.S. CONST., AMEND. I. The Free Press Clause is applicable to the States by virtue of the Fourteenth Amendment's Due Process Clause. *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 707, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). PG maintains that § 3060(d) cannot be constitutionally enforced against its reporters and photographers. Docket No. 28 at ¶¶ 25-32.

"In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed." *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). In both "traditional" and "designated" public fora, "content-based restrictions on speech are subject to strict scrutiny." *Pittsburgh League of Young Voters Education Fund v. Port Authority of Allegheny County*, 653 F.3d 290, 295-296 (3d Cir. 2011). A restriction satisfies strict scrutiny only if it is "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end." *Perry Education Assocation*, 460 U.S. at 45. Laws regulating the time, place and manner of speech in a public forum must be content-neutral, serve a significant governmental interest, and leave open alternative channels of communication. *United States Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 132, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981). Regulations governing expressive activities on public property that is neither a "traditional public forum" nor a "designated public forum" "must survive only a much more limited review." *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). Restrictions on a speaker's access to a "nonpublic forum" must be reasonable and viewpoint-neutral. *Pittsburgh League of Young Voters Education Fund*, 653 F.3d at 296. It is permissible for a State to "create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Pleasant Grove City v. Summum*, 555 U.S. 460, 470, 129 S.Ct. 1125, 172 L.Ed.2d 853

(2009). Restrictions on access to a "limited public forum" must be "reasonable in light of the purpose served by the forum" and "must not discriminate against speech on the basis of viewpoint." *Good News Club v. Milford Central School*, 533 U.S. 98, 106-107, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001); *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Regardless of the nature of the forum at issue, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).

In *Burson v. Freeman*, 504 U.S. 191, 193, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992)(plurality opinion), the Supreme Court was presented with a constitutional challenge to a Tennessee statute prohibiting "the solicitation of votes and the display or distribution of campaign materials within 100 feet of the entrance to a polling place." Justice Thomas did not participate in the consideration or decision of the case. The challenged statute was upheld by a 5-3 vote of the eight participating Justices. *Burson*, 504 U.S. at 193-216. A plurality consisting of Justice Blackmun, Justice White, Justice Kennedy and Chief Justice Rehnquist classified the statute as "a facially content-based restriction of political speech in a public forum" and subjected it to "exacting scrutiny." *Id.* at 198. Referring to Tennessee's "compelling interest" in preventing "voter intimidation and election fraud," the plurality concluded that the statutory proscription was valid. *Id.* at 206-211. The fifth vote to uphold the statute was provided by Justice Scalia, who did not believe the area surrounding a polling place to be a public forum. *Id.* at 214-216 (Scalia, J., concurring in the judgment). Declining to apply strict scrutiny, Justice Scalia described the prohibition as "a reasonable, viewpoint-neutral regulation" of speech in a

"nonpublic forum." *Id.* at 214 (Scalia, J. concurring in the judgment).  In a dissenting opinion joined by Justice O'Connor and Justice Souter, Justice Stevens expressed the view that strict scrutiny was the proper test, and that Tennessee had failed to "shoulder the burden of demonstrating that its restrictions on political speech [we]re no broader than necessary to protect orderly access to the polls." *Id.* at 217-228 (Stevens, J., dissenting).

The plurality in *Burson* treated the Tennessee statute as a content-sensitive restriction on speech in a "quintessential public forum." *Burson*, 504 U.S. at 197.  Speaking through Justice Blackmun, the plurality explained:

> The Tennessee restriction under consideration . . . is not a facially content-neutral time, place, or manner restriction.  Whether individuals may exercise their free speech rights near polling places depends entirely on whether their speech is related to a political campaign.  The statute does not reach other categories of speech, such as commercial solicitation, distribution, and display.  This Court has held that the First Amendment's hostility to content-based regulation extends not only to a restriction on a particular viewpoint, but also to a prohibition of public discussion of an entire topic.

*Id.* at 197.  The content-based nature of the statute triggered the application of strict scrutiny.  *Id.* at 197-198.  After reviewing the history of prohibitions similar to the one enacted by Tennessee, the plurality concluded its analysis by stating as follows:

> In conclusion, we reaffirm that it is the rare case in which we have held that a law survives strict scrutiny.  This, however, is such a rare case.  Here, the State, as recognized administrator of elections, has asserted that the exercise of free speech rights conflicts with another fundamental right, the right to cast a ballot in an election free from the taint of intimidation and fraud.  A long history, a substantial consensus, and simple common sense show that some restricted zone around polling places is necessary to protect that fundamental right.  Given the conflict between these two rights, we hold that requiring solicitors to stand 100 feet from the entrances to polling places does not constitute an unconstitutional compromise.

*Id.* at 211.  Although the three dissenting Justices expressed disagreement with the decision to sustain the challenged statute, they observed that "a prohibition against the presence of nonvoters" within a polling place itself, or within ten feet of its entrance, would be "justified." *Id.* at 219, n. 2 (Stevens, J., dissenting).

Unlike the Tennessee statute challenged in *Burson*, which restricted the *content* of speech uttered by individuals who were located in areas accessible to the general public, § 3060(d) speaks only to who "must remain at least ten (10) feet distant from the polling place during the progress of the voting."  25 PA. STAT. § 3060(d).  It does not "restrict speech as such." *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).  The parties dispute whether a polling area governed by § 3060(d) constitutes a "public forum" or a "nonpublic forum."  Docket No. 31 at 14-21; Docket No. 36 at 24-26. Because the challenged regulation governs one's *physical location* rather than his or her *speech*, the property falling within its sweep cannot be fairly characterized as a "forum."[11]  "Where the property is not a traditional public forum and the government has not chosen to create a designated public forum, the property is either a nonpublic forum or *not a forum at all*." *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666, 678-679, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998)(emphasis added).  The property covered by § 3060(d) "is not available for general public discourse of any sort." *Marlin v. District of Columbia Board of Elections & Ethics*, 236 F.3d 716, 719 (D.C.Cir. 2001).  It is not comparable to the property covered by the Tennessee statute, which was lawfully occupied by individuals who were free to engage in "commercial solicitation, distribution, and display." *Burson*, 504 U.S. at 197.  The "forum principles" discussed by the parties "are out of place in the context of this case." *United States v.*

---

[11] Since the instant case does not involve a "forum," there is no need for the Court to consider the extent to which a "nonpublic forum" differs from a "limited public forum." *Galena v. Leone*, 638 F.3d 186, 197, n. 8 (3d Cir. 2011).

*American Library Association, Inc.*, 539 U.S. 194, 205, 123 S.Ct. 2297, 156 L.Ed.2d 221

(2003)(plurality opinion). One's presence in an area closed to the public at large "is not a form

of expression to which forum analysis applies."[12] *Summum*, 555 U.S. at 464.

Because § 3060(d) operates as a content-neutral regulation governing the *physical*

*location* of those seeking to observe or influence polling activities, the factors which led seven

Justices to apply strict scrutiny in *Burson* are entirely absent in this case. *Burson*, 504 U.S. at

219, n. 2 (Stevens, J., dissenting)(remarking that "[w]ithin the polling place itself, and within 10

feet of its entrance, a prohibition against the presence of nonvoters is justified"). PG maintains

that § 3060(d)'s *application to the press* should be subjected to strict scrutiny. Docket No. 36 at

15. That contention, however, is not consistent with the applicable Supreme Court precedents.

A State can subject members of the media to "generally applicable" restrictions "without

creating constitutional problems." *Minneapolis Star & Tribune Co. v. Minnesota Commissioner*

*of Revenue*, 460 U.S. 575, 581, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983). The "enforcement of

such general laws against the press *is not subject to stricter scrutiny* than would be applied to

[their] enforcement against other persons or organizations." *Cohen v. Cowles Media Co.*, 501

U.S. 663, 670, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991)(emphasis added). "[T]he

characterization of an entity as a member of the 'media' is irrelevant" when a generally

applicable law is at issue. *Simon & Schuster, Inc. v. Members of the New York State Crime*

*Victims Board*, 502 U.S. 105, 117, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). A "compelling

justification" for a law is required only where a State attempts to "single out the press" for

disfavored treatment. *Leathers v. Medlock*, 499 U.S. 439, 447, 111 S.Ct. 1438, 113 L.Ed.2d 494

(1991).

---

[12] Even if the area covered by § 3060(d) could be fairly characterized as a "forum," it would have to be treated as a "nonpublic forum" for constitutional purposes. *Minnesota Majority v. Mansky*, 789 F.Supp.2d 1112, 1121-1123 (D.Minn. 2011); *Poniktera v. Seiler*, 104 Cal.Rptr.3d 291, 301-303 (Cal.Ct.App. 2010).

The fact that § 3060(d) may *indirectly* restrict the ability of *Post-Gazette* reporters to cover polling activities is of no constitutional significance. "The right to speak and publish does not carry with it the unrestrained right to gather information." *Zemal v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965). "[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg v. Hayes*, 408 U.S. 665, 684, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). The Supreme Court has consistently held that "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Cohen*, 501 U.S. at 669.

The presence of "election officers, clerks, machine inspectors, overseers, watchers, persons in the course of voting, persons lawfully giving assistance to voters, and peace and police officers" in the areas from which the public is excluded does not deprive § 3060(d) of its status as a neutral law of general application. 25 Pa. Stat. § 3060(d). In *Pell v. Procunier*, 417 U.S. 817, 834, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), the Supreme Court declared that "newsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public." In an opinion delivered by Justice Stewart, the Supreme Court observed:

> Inmates are permitted to receive limited visits from members of their families, the clergy, their attorneys, and friends of prior acquaintance. The selection of these categories of visitors is based on the Director's professional judgment that such visits will aid in the rehabilitation of the inmate while not compromising the other legitimate objectives of the corrections system. This is not a case in which the selection is based on the anticipated content of the communication between the inmate and the prospective visitor. If a member of the press fell within any of these categories, there is no suggestion that he would not be permitted to visit with the inmate. More importantly, however, inmates have an unrestricted opportunity to communicate with the press or any other member of the public through their families, friends, clergy, or attorneys who are permitted to visit them at the prison. Thus, this provides another alternative avenue of communication between prison inmates and persons outside the prison.

*Pell*, 417 U.S. at 824-825 (footnote omitted).  The reasoning employed in *Pell* applies with equal force to § 3060(d).  Pennsylvania may constitutionally exclude the general public from polling places while providing access to those whose functions are essential to the electoral process.  *Id.* at 824-827.  It is worth noting that a voter, unlike a prison inmate, is not subject to restrictions limiting his or her *direct* access to members of the press.  Since election officials have no authority to prevent voters from leaving a polling place, voters have an unrestrained ability to speak with reporters about any difficulties that they may encounter while registering with election officials or casting their votes.

In *Mills v. Alabama*, 384 U.S. 214, 215-220, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966), the Supreme Court invalidated an Alabama statute making it a criminal offense for the editor of a daily newspaper to publish an editorial on Election Day urging people to vote in a certain way on issues appearing on the ballot.  The challenged enactment was described as an "obvious and flagrant abridgment of the constitutionally guaranteed freedom of the press."  *Mills*, 384 U.S. at 219.  The Supreme Court carefully distinguished the circumstances in *Mills* from the circumstances of the present case by stating as follows:

> The First Amendment, which applies to the States through the Fourteenth, prohibits laws "abridging the freedom of speech, or of the press."  The question here is whether it abridges freedom of the press for a State to punish a newspaper editor for doing no more than publishing an editorial on election day urging people to vote a particular way in the election.  We should point out at once that this question in no way involves the extent of a State's power to regulate conduct in and around the polls in order to maintain peace, order and decorum there.

*Mills*, 384 U.S. at 218.  Unlike the statute invalidated in *Mills*, which attempted to "silence[] the press at a time when it c[ould] be most effective," § 3060(d) does not target the press for unfavorable treatment or restrict the expression of newspaper reporters.  *Id.* at 219.

The Supreme Court has held that "the press *and general public* have a constitutional right of access to criminal trials."[13]  *Globe Newspaper Co. v. Superior Court for the County of Norfolk*, 457 U.S. 596, 603, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982)(emphasis added).  PG alludes to that right in support of its efforts to secure access to polling places on Election Day.  Docket No. 36 at 19-20.  The logic behind the decisions affording individuals a right of access to criminal trials, however, provides no support for the position taken by PG in this case.  A courtroom hosting criminal trials is "a public place where *the people generally*—and representatives of the media—have a right to be present."  *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 578, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980)(plurality opinion)(emphasis added; footnote omitted).  Where a judicial proceeding places an individual's liberty at stake, "the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known."  *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 508, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)(emphasis in original).  PG argues that the *Post-Gazette*, "as a member of the press," enjoys a constitutional right of access to polling places.  Docket No. 36 at 15.  The Court does not understand PG to argue that polling places should be open to *everyone* who wishes to enter.  Docket No. 41 at 95-96.  It is beyond dispute that access to polling places must be limited "if some sort of order, rather than chaos, is to accompany the democratic process."  *Storer*, 415 U.S. at 730.  The decisions recognizing a right of access to criminal trials enjoyed by members of the *general public* do not support the assertion that the Constitution affords newspaper reporters a *special* right of access to

---

[13] The Sixth Amendment provides that, "[i]n all criminal prosecutions, *the accused* shall enjoy the right to a speedy and *public trial* . . . ."  U.S. CONST., AMEND. VI (emphasis added).  Although the right to a "public trial" under the Sixth Amendment may be asserted only by "the accused," the Supreme Court has recognized that the First Amendment provides members of the general public with a constitutional right to attend criminal trials.  *Presley v. Georgia*, 558 U.S. 209, ___, 130 S.Ct. 721, 723, 175 L.Ed.2d 675 (2010)(*per curiam*).  Both rights are incorporated within the Due Process Clause of the Fourteenth Amendment.  *Id.*

polling places.[14] *Sioux Falls Argus Leader v. Miller*, 610 N.W.2d 76, 84 (S.D. 2000)(remarking that "the First Amendment grants the press no right to information about a trial superior to that of the general public").

In *Beacon Journal Publishing Co., Inc. v. Blackwell*, 389 F.3d 683, 684-685 (6th Cir. 2004), the United States Court of Appeals for the Sixth Circuit appears to have reasoned that a generally applicable Ohio statute prohibiting access to polling places could not be constitutionally enforced against members of the press. That decision, which was issued on the morning of the 2004 general election, provided newspaper reporters with "reasonable access to any polling place for the purpose of news-gathering and reporting" as long as they did not "interfere with poll workers and voters as voters exercise[d] their right to vote." *Beacon Journal*, 389 F.3d at 685. It is not clear whether the "reasonable access" provided in *Beacon Journal* consisted of access as extensive as that sought by PG in this case. Although one subsection of the challenged statute restricted entry into a polling place, a separate subsection prohibited individuals from loitering and congregating "within the area between the polling place and the small flags of the United States placed on the thoroughfares and walkways leading to the polling place." *Id.* at 684, quoting OHIO REV. CODE § 3501.35 (Anderson 2002). The parties have not explained whether the area covered by the Ohio statute was larger than the area covered by § 3060(d), or whether the enforcement of the Ohio statute against members of the media would have effectively denied them access to voters entering and exiting polling places. In any event, the reasoning employed in *Beacon Journal* appears to be in tension with the "well-established line of decisions holding that generally applicable laws do not offend the First

---

[14] Although reporters and members of the general public have a constitutional right to *attend* criminal trials, they do not have a constitutional right to *take photographs* of the judicial proceedings. *Tribune Review Publishing Co. v. Thomas*, 254 F.2d 883, 884-885 (3d Cir. 1958); *Commonwealth v. Davis*, 635 A.2d 1062, 1065-1070 (Pa.Super.Ct. 1993).

Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." *Cohen*, 501 U.S. at 669. Since § 3060(d) "does not deny the press access to sources of information available to members of the general public," "it does not abridge the protections that the First and Fourteenth Amendments guarantee." *Pell*, 417 U.S. at 835.

Because PG challenges § 3060(d) only as applied to members of the press, there is no need for an exhaustive examination of Pennsylvania's reasons for requiring bystanders to remain at least ten feet from a polling place. The constitutionality of § 3060(d)'s application to members of the general public is not contested. Nonetheless, the reasoning employed in *Burson* inevitably leads to the conclusion that § 3060(d) is constitutionally permissible. *Burson*, 504 U.S. at 200 (stating that "the evolution of election reform, both in this country and abroad, demonstrates the necessity of restricted areas in or around polling places").

"A court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). "Regulations imposing 'severe burdens' on the exercise of First Amendment rights 'must be narrowly tailored to advance a compelling state interest.'" *Project Vote*, 805 F.Supp.2d at 172, quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997). "Lesser burdens, however, trigger

less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Timmons*, 520 U.S. at 358.

The application of § 3060(d) does not impose a "severe burden" on the exercise of First Amendment rights. *Project Vote*, 805 F.Supp.2d at 172. The ten-foot zone carved out by § 3060(d) does not deprive newspaper reporters of their ability to speak with voters. *Burson*, 504 U.S. at 210 (describing a "100-foot boundary line" as a "minor geographic limitation"). The horizontal distance between a polling place and the line drawn by § 3060(d) is equal to the vertical distance between a basketball court and a basketball hoop. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 701, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001)(Scalia, J., dissenting). Anyone who has seen a player slam dunk knows that ten feet is not an insurmountable distance. While reasonable minds may differ as to whether larger restricted zones would create constitutional problems, one need only rely on "simple common sense" to conclude that requiring bystanders to remain ten feet from the entrance to a polling place "does not constitute an unconstitutional compromise." *Burson*, 504 U.S. at 211. "Protecting those who seek to exercise their right to vote from distraction, interruption, or harassment is a significant governmental interest." *Firestone v. News-Press Publishing Co., Inc.*, 538 So.2d 457, 460 (Fla. 1989). The vindication of that interest is sufficient to justify the reasonable, nondiscriminatory restriction created by § 3060(d). *Timmons*, 520 U.S. at 358. Given that newspaper reporters have no constitutional right to "enter an office or dwelling to gather news," it necessarily follows that they have no constitutional right to enter a polling place to gather news. *Cohen*, 501 U.S. at 669.

PG maintains that an evidentiary hearing is necessary to facilitate a determination as to whether § 3060(d) is constitutional. Docket No. 36 at 25. Under the present circumstances, however, the constitutional validity of § 3060(d) does not turn on any "adjudicative facts."

*Project Vote*, 805 F.Supp.2d at 184.  The General Assembly is "permitted to respond to potential deficiencies in the electoral process with foresight." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986).  The Supreme Court has never "held a State 'to the burden of demonstrating empirically the objective effects on political stability that [are] produced' by the voting regulation in question." *Burson*, 504 U.S. at 208 (brackets in original), quoting *Munro*, 479 U.S. at 195.  "Such a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action." *Munro*, 479 U.S. at 195.  Admittedly, "more specific findings" would be needed to sustain a regulation "directed at intangible 'influence,' such as the ban on election-day editorials struck down in *Mills*." *Burson*, 504 U.S. at 209, n. 11.  Nonetheless, a State need not establish an evidentiary predicate for proscribing conduct which "threatens to interfere with the act of voting itself." *Id.* "A long history, a substantial consensus, and simple common sense show that some restricted zone around polling places is necessary to protect" the right of voters to cast their ballots.[15] *Id.* at 211.  Nothing proven (or disproven) at a hearing would change the constitutional calculus in this case.  *Munro*, 479 U.S. at 195-196; *Project Vote*, 805 F.Supp.2d at 184-185.

The argument advanced by PG "invites the Court to involve itself in what is clearly a legislative task which the Constitution has left to the political processes." *Houchins v. KQED, Inc.*, 438 U.S. 1, 12, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978)(plurality opinion).  Statutory provisions such as § 3060(d) "are subject to legislative revision" and can be tailored to address the "special circumstances" confronted by "particular governmental offices and agencies." *Borough of Duryea v. Guarnieri*, ___U.S.___, ___, 131 S.Ct. 2488, 2497, 180 L.Ed.2d 408

---

[15] Because the interests recognized in *Burson v. Freeman*, 504 U.S. 191, 198-211, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992)(plurality opinion), are sufficient to justify § 3060(d)'s application to members of the press, the Court has no occasion to consider whether the presence of newspaper reporters within a polling place would expose voters to the risk of identity theft.  Docket No. 41 at 32-33.

(2011). The General Assembly remains free to enact legislation providing the accommodations desired by PG. *Richmond Newspapers, Inc.*, 448 U.S. at 581, n. 18 (recognizing the prerogative of a court to provide "preferential seating for media representatives" seeking to cover criminal trials). With respect to congressional elections, the concerns expressed by PG can also be remedied by Congress. "[I]t is well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster*, 522 U.S. at 69, quoting *U.S. Term Limits, Inc.*, 514 U.S. at 833. PG remains free to advocate its cause in the political arena.

Unlike elected officials, "who can be thrown out of office if the people disagree with them," federal courts "possess neither the expertise nor the prerogative to make policy judgments." *National Federation of Independent Business v. Sebelius*, ___ U.S. ___, ___, 132 S.Ct. 2566, 2579, 183 L.Ed.2d 450 (2012). A court presented with a challenge to a generally applicable statutory provision limiting access to governmental activities "must not confuse what is 'good,' 'desirable,' or 'expedient' with what is constitutionally commanded by the First Amendment." *Houchins*, 438 U.S. at 13. The prohibition contained in § 3060(d) is a neutral law of general application seeking to protect an individual's "right to cast a ballot in an election free from the taint of intimidation and fraud." *Burson*, 504 U.S. at 211. "The First Amendment does not forbid its application to the press." *Cohen*, 501 U.S. at 670.

### F.      The Claims Arising Under the Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment prohibits a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST., AMEND. XIV, § 1. This constitutional provision "embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly." *Vacco v. Quill*, 521 U.S. 793, 799, 117

S.Ct. 2293, 138 L.Ed.2d 834 (1997). "The primary purpose of the Equal Protection Clause is 'to secure every person within [a] State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by [the] express terms of a statute or by its improper execution through duly constituted agents.'" *Whittaker v. County of Lawrence*, 674 F.Supp.2d 668, 691 (W.D.Pa. 2009)(brackets in original), quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445, 43 S.Ct. 190, 67 L.Ed.2d 340 (1923). The Supreme Court has explained that state-occasioned discrimination against a particular individual (*i.e.*, discrimination against a "class of one") violates the Equal Protection Clause where "no rational basis" exists for treating him or her "differently from others similarly situated." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)(*per curiam*).

PG alleges that the Defendants have repeatedly violated the Equal Protection Clause by "selectively enforcing" § 3060(d) against reporters and photographers working for the *Post-Gazette*. Docket No. 28 at ¶¶ 34-35, 38-39. The claims asserted under the Equal Protection Clause are premised on two separate fact patterns. In the amended complaint, PG avers that while employees of the *Post-Gazette* have been denied access to polling places in Allegheny and Beaver Counties, reporters and photographers employed by other newspapers have been permitted to enter and photograph polling places in Lancaster, Cumberland, Dauphin, York and Northampton Counties. *Id.* at ¶ 14. It is alleged that the *Post-Gazette* "is similarly situated to these other media outlets," and that "no rational reasons" justify this perceived "difference in treatment." *Id.* at ¶ 15. PG also alleges that photographers employed by various newspapers (including the *Post-Gazette*) have been permitted to photograph certain public officials and candidates in the act of voting. *Id.* at ¶¶ 16-17, 35, 39. Photographs of these individuals were allegedly taken within the confines of polling places located in Allegheny County. *Id.* at ¶¶ 16-

17.  PG avers that Allegheny County has "no rational reasons" for permitting access to polling places when elected officials are voting and "denying access at all other times." *Id.* at ¶¶ 17, 35, 39.

It is beyond dispute that the "selective enforcement" of a statute can violate the Equal Protection Clause in certain instances. *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). "The Equal Protection Clause prohibits selective enforcement 'based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" *United States v. Batchelder*, 442 U.S. 114, 125, n. 9, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979), quoting *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). A plaintiff attempting to establish a constitutional violation under this theory must demonstrate that he or she has been "treated differently from other similarly situated individuals," and that this selective treatment has been "based on an unjustifiable standard." *Dique v. New Jersey State Police*, 603 F.3d 181, 184, n. 5 (3d Cir. 2010)(internal quotation marks omitted). A standard is "unjustifiable" if it is designed to prevent the "exercise of a fundamental right."[16] *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005); *United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir. 1989). The constitutional analysis in this case does not turn on whether § 3060(f) *requires* (or merely *authorizes*) the enforcement of § 3060(d)'s ten-foot boundary requirement. 25 PA. STAT. § 3060(f). A legislative prescription that is "mandatory in theory" may turn out to be "discretionary in practice." *Holder v. City of Allentown*, 987 F.2d 188, 197 (3d Cir. 1993). The critical question is whether § 3060(d) has been enforced against PG's newspaper "with an evil eye and an unequal hand." *Yick Wo v. Hopkins*, 118 U.S. 356, 373-374, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

---

[16] "[C]lassifications affecting fundamental rights" are subjected to "exacting scrutiny" under the Equal Protection Clause. *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988).

The factual allegations pertaining to practices in other parts of the Commonwealth illustrate only that § 3060(d) may be enforced more rigidly in Allegheny and Beaver Counties than it is in Lancaster, Cumberland, Dauphin, York and Northampton Counties.  Docket No. 28 at ¶¶ 14-15, 34, 38.  PG does not allege that *Post-Gazette* employees were selectively denied access to polling places in Lancaster, Cumberland, Dauphin, York and Northampton Counties, or that employees of other newspapers were selectively provided with access to polling places in Allegheny and Beaver Counties.  *Id.*  Instead, PG premises its claim to relief on an assertion that *Post-Gazette* employees are not provided with the same access in Allegheny and Beaver Counties that employees of other newspapers are provided with in *other* counties.  The conduct alleged by PG does not amount to a violation of the Fourteenth Amendment.  *Salsburg v. Maryland*, 346 U.S. 545, 551, 74 S.Ct. 280, 98 L.Ed. 281 (1954)("The Equal Protection Clause relates to equality between *persons* as such rather than between *areas*.")(emphasis added).  Indeed, the averments contained in the amended complaint do not even establish that reporters and photographers working for the *Post-Gazette* have been "*treated differently* from other similarly situated individuals."  *Dique*, 603 F.3d at 184, n. 5 (emphasis added).  The facts alleged by PG suggest only that employees of the *Post-Gazette* unsuccessfully sought to enter polling places located in counties where § 3060(d) is enforced, and that employees of other newspapers were allowed to enter polling places in counties where § 3060(d) is not enforced.  Docket No. 28 at ¶¶ 14-15.  The *difference* highlighted by PG relates to the geographical areas covered by newspaper reporters rather than to the respective *treatment* of those reporters by governmental officials.  A plaintiff cannot establish a violation of the Equal Protection Clause simply by showing that the effects of a statewide regulation or policy vary from one local entity to the next.[17] *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 53-55, 93 S.Ct. 1278,

---

[17] The instant case does not present a situation in which varying standards employed by different local entities have

36 L.Ed.2d 16 (1973). The Fourteenth Amendment does not require "territorial uniformity." *McGowan v. Maryland*, 366 U.S. 420, 427, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

The perceived unlawfulness of the conduct permitted in other counties does not change the constitutional formula. "The unlawful administration by state officials of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination." *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed.2d 497 (1944). PG's factual allegations fail to establish that a single election official has *discriminated* against reporters working for the *Post-Gazette*. The amended complaint contains no allegation that a *Post-Gazette* reporter has been denied entry to a polling place that is accessible to other reporters, or that other reporters have been permitted to enter a polling place from which *Post-Gazette* reporters are excluded. Docket No. 28 at ¶¶ 14-15. In this respect, the averments put forth by PG do not "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

The same principle applies to the allegations relating to the photographing of elected officials in the act of voting. Docket No. 28 at ¶¶ 17, 35, 39. PG alleges that the Defendants have violated the Equal Protection Clause by permitting photographers (including *Post-Gazette* photographers) to enter polling places while "certain public officials" are voting and "denying access at all other times." *Id.* at ¶ 17. That type of "selectivity" does not raise constitutional concerns. *Oyler*, 368 U.S. at 456 (stating that "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation"). Employees of the *Post-Gazette* are not subjected to *different treatment* when they are permitted or forbidden to enter polling

caused a State to "value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-105, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000)(*per curiam*).

places under the same circumstances as employees of other newspapers. *Dique*, 603 F.3d at 184, n. 5. Moreover, the decision to enforce a law typically involves "discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591, 603, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008). The Equal Protection Clause has never been understood to require strict uniformity in the enforcement of a statute. *Id.* at 603-604. A plaintiff cannot establish a constitutional violation simply by demonstrating that a law enforced against him or her has been left unenforced on prior occasions. *Enntex Oil & Gas Co. v. Texas*, 560 S.W.2d 494, 497-498 (Tex.Civ.App. 1977). The Fourteenth Amendment does not deprive governmental officials of their discretion to enforce (or not enforce) statutory provisions. *United States v. Armstrong*, 517 U.S. 456, 463-467, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). If it were otherwise, a State would be required to issue citations to *all* speeding motorists in order to enforce its maximum-speed regulations against *any* speeding motorist. *Engquist*, 553 U.S. at 603-604. The Constitution does not require a State to adopt such an all-or-nothing approach to law enforcement. *Bordenkircher v. Hayes*, 434 U.S. 357, 364-365, 98 S.Ct. 663, 54 L.Ed.2d 604 (1977).

It is axiomatic that the Equal Protection Clause prohibits public officials from selectively enforcing the law on the basis of an arbitrary or unjustifiable criterion. *Thomas v. Independence Township*, 463 F.3d 285, 297-298 (3d Cir. 2006)(finding allegations of selective enforcement attributable to a plaintiff's "race and ancestry" to sufficiently allege a constitutional violation); *United States v. Al Hedaithy*, 392 F.3d 580, 606 (3d Cir. 2004)(observing that "a prosecutorial decision made on the basis of race is *per se* unjustifiable")(emphasis in original). The allegations made by PG, however, fail to demonstrate that election officials have targeted employees of the

*Post-Gazette* for disfavored treatment.[18]  Docket No. 28 at ¶¶ 14-18, 34-35, 38-39.  Indeed, those allegations suggest that reporters working for the *Post-Gazette* were afforded or denied access to polling places in Allegheny County under the same conditions, and on the same terms, as reporters working for other newspapers.  Docket No. 28 at ¶¶ 35, 39.  By permitting access to polling places only while elected officials were voting and "denying access at all *other times*," election officials in Allegheny County did not deny *Post-Gazette* employees access that was available to *other persons*.  *Id.* at ¶ 17 (emphasis added).  It is unconstitutional for a State to "deny to any *person* within its jurisdiction the equal protection of the laws."  U.S. CONST., AMEND. XIV, § 1 (emphasis added).  The Fourteenth Amendment does not prohibit a State from discriminating against a particular time or circumstance.  *Vacco*, 521 U.S. at 799-800.  It would be an understatement to say that the "classification" described by PG is not "arbitrary."  *Oyler*, 368 U.S. at 456.  PG's allegations do not even establish the existence of a "classification" subject to the mandate of the Equal Protection Clause.  That constitutional provision "creates no substantive rights."  *Vacco*, 521 U.S. at 799.  Nobody is denied the "*equal* protection of the laws" when statutory mandates are selectively enforced against *all persons*.  U.S. CONST., AMEND. XIV, § 1 (emphasis added).  "General rules that apply evenhandedly to *all persons* . . . unquestionably comply with" the Equal Protection Clause.  *New York City Transit Authority v. Beazer*, 440 U.S. 568, 587, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979)(emphasis added).  Accordingly, the claims arising under the Equal Protection Clause will be dismissed.  Docket No. 28 at ¶¶ 33-40.

## VI.    The Motions Requesting the Entry of a Consent Decree

---

[18] The Court is not required to credit PG's "bare assertion" that it was subjected to "intentional discrimination." Docket No. 28 at ¶ 14; *Ashcroft v. Iqbal*, 556 U.S. 662, 681, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

PG, the Division Manager and the Board jointly seek to terminate this action through the entry of a consent decree enjoining the enforcement of § 3060(d) against media representatives in Allegheny County. Docket Nos. 52-1 & 56. The Secretary "has declined to consent" to this proposed resolution. Docket No. 52 at 2, ¶ 3. Since no basis in law exists for prohibiting the enforcement of § 3060(d) against newspaper reporters, the motions requesting the entry of a consent order will be denied. Docket Nos. 52 & 58.

"Consent decrees have elements of both contracts and judicial decrees." *Frew v. Hawkins*, 540 U.S. 431, 437, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004). Although a consent decree is "contractual" in that it "embodies an agreement of the parties," it is also a legally enforceable "judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). The terms of a consent decree must conform to all applicable laws. *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990). Any valid consent decree "must further the objectives of the law upon which the [plaintiff's] complaint [i]s based." *Local Number 93, International Association of Firefighters, AFL-CIO, C.L.C. v. City of Cleveland*, 478 U.S. 501, 525, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). The Supreme Court has admonished that, in cases involving claims arising directly under the Constitution, "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that *does not violate the Constitution* or does not flow from such a violation." *Milliken v. Bradley*, 433 U.S. 267, 282, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977)(emphasis added). "'If [a federal consent decree is] not limited to reasonable and necessary implementations of federal law,' it may 'improperly deprive future officials of their designated legislative and executive powers.'" *Horne v. Flores*, 557 U.S.

433, 450, 129 S.Ct. 2579, 174 L.Ed.2d 406 (2009)(brackets in original), quoting *Frew*, 540 U.S. at 441.

PG relies on *Pacific Railroad v. Ketchum*, 101 U.S. 289, 25 L.Ed. 932 (1879), and *Sansom Committee v. Lynn*, 735 F.2d 1535 (3d Cir. 1984), for the proposition that the Court may approve any proposed consent decree falling within the scope of the facts alleged in the amended complaint. Docket No. 61 at 8-10. Those decisions, however, do not sweep as broadly as PG suggests. In *Pacific Railroad*, the Supreme Court observed that a federal court presented with a proposed consent decree "will ordinarily give effect" to any agreement that "comes within the general scope of *the case made by the pleadings*." *Pacific Railroad*, 101 U.S. at 297 (emphasis added). In *Sansom Committee*, the United States Court of Appeals for the Third Circuit recognized a district court's power to enter a decree "*if the pleadings state a claim* over which a federal court has jurisdiction." *Sansom Committee*, 735 F.2d at 1538 (emphasis added). Both decisions refer to a situation in which a case has been made, or in which a claim has been stated. They do not provide support for the entry of a consent decree in a case in which the complaint fails to allege an actionable violation of federal law. Admittedly, a consent decree can sometimes be entered in the absence of a formal "adjudication of liability." *Lawyer v. Dept. of Justice*, 521 U.S. 567, 579, n. 6, 117 S.Ct. 2186, 138 L.Ed.2d 669 (1997). Nevertheless, there must be "a substantial evidentiary and legal basis" for the plaintiff's claim in order for a decree to be entered. *Id.* at 574 (internal quotation marks omitted); David W. Swift, *A State's Power to Enter into a Consent Decree that Violates State Law Provisions: What "Findings" of a Federal Violation are Sufficient to Justify a Consent Decree that Trumps State Law?*, 10 Texas Journal on Civil Liberties & Civil Rights 37, 45 (2004). Since the amended complaint fails to state a claim to relief, that standard is not satisfied in this case.

The Court has already determined that § 3060(d) can be constitutionally applied to media representatives. A consent decree cannot be used to override a valid state statute. *Perkins v. City of Chicago Heights*, 47 F.3d 212, 216 (7th Cir. 1995). A federal court may displace state law with a consent decree only for the purpose of rectifying a violation of federal law. *St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264, 270-271 (8th Cir. 2011). The parties to this case cannot use a consent decree to enforce "terms which would exceed their authority and supplant state law." *Keith v. Volpe*, 118 F.3d 1386, 1393 (9th Cir. 1997).

The Board's authority to "make and issue" rules governing the conduct of elections extends only to the promulgation of rules that are "not inconsistent with law." 25 Pa. Stat. § 2642(f). As the Court of Common Pleas recognized four years ago, the access sought by PG would directly contravene § 3060(d). Docket No. 31-4 at 2-3. That provision has been construed to prohibit everyone other than "the excepted persons" from remaining within the restricted zone while a polling place is open for voting. *Finnegan Appeal*, 75 A.2d 812, 814 (Pa. 1950). Since § 3060(d) speaks to one's physical presence within the restricted zone rather than to what he or she may do therein, the proposed revision permitting a voter to object to being photographed is beside the point. Docket No. 56 at 2. With or without a camera, a newspaper reporter who does not qualify as an "excepted person" cannot remain within a polling place on Election Day. *Finnegan Appeal*, 75 A.2d at 814. The consent order proposed by the parties simply cannot be reconciled with the language of § 3060(d). *Clark v. Witkin*, 70 Pa. D. & C. 122, 123 (C.P.Phila.Cty. 1949)(remarking that "the election laws are clear and specific as to who may be admitted to the polling places"). Indeed, the Division Manager and the Board have previously argued, in this very case, that they have no legal authority to accede to PG's demands. Docket No. 24 at 2; Docket No. 33 at 4. The Court cannot approve a consent decree reaching

beyond the authority delegated to the Division Manager and the Board under Pennsylvania law. *Baldwin v. Cortes*, 378 Fed.Appx. 135, 138-139 (3d Cir. 2010)(recognizing the validity of a consent decree that had been entered into pursuant to the General Assembly's "explicit delegation of authority to the Secretary of the Commonwealth to administer the state election scheme").

As explained earlier, the General Assembly's authority to enact § 3060(d) comes not only from the Pennsylvania Constitution, but also from the United States Constitution. *Project Vote*, 805 F.Supp.2d at 174-175; U.S. CONST., ART. I, § 4; U.S. CONST., ART. II, § 1; PA. CONST., ART. VII, §§ 4, 6. The Elections Clause specifically delegates the power to prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives" to the "Legislature" of each State. U.S. CONST., ART. I, § 4. These "comprehensive words" embrace the General Assembly's authority to regulate the "supervision of voting," the "protection of voters," and the "prevention of fraud and corrupt practices." *Smiley v. Horn*, 285 U.S. 355, 366, 52 S.Ct. 397, 76 L.Ed. 795 (1932). When a State acts pursuant to its authority under the Elections Clause, its laws may be "alter[ed]" by Congress. U.S. CONST., ART. I, § 4; *Foster*, 522 U.S. at 69. Nothing in the Constitution gives federal courts a similar power to "alter" a State's election laws. The Court has no authority to carve exceptions into § 3060(d).

Pursuant to Article II, § 1, of the Constitution, a State's Presidential electors must be appointed "in such manner as the Legislature thereof may direct." U.S. CONST., ART. II, § 1. The Supreme Court has characterized this provision as a grant of "plenary power to the state legislatures in the matter of the appointment of electors." *McPherson*, 146 U.S. at 35. In the context of a Presidential election, the General Assembly's directives cannot be replaced by a judicially-enforceable order deemed to be more equitable than the balance achieved by state law.

*Bush v. Palm Beach County Canvassing Board*, 531 U.S. 70, 76-78, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000)(*per curiam*).  Acceptance of the proposed consent decree would unconstitutionally divest the General Assembly of its authority to prescribe the manner in which Pennsylvania's Presidential electors will be appointed.  *Bush v. Gore*, 531 U.S. 98, 112-113, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000)(Rehnquist, C.J., concurring)(explaining that because the authority comes directly from the United States Constitution, "the text of the election law itself . . . takes on independent significance").  The fact that this case implicates the General Assembly's *federal* constitutional powers (in addition to its *state* constitutional powers) strongly counsels against the entry of a consent decree that, for all intents and purposes, would "alter" the meaning of § 3060(d) throughout Allegheny County.

This case does not present a situation in which the General Assembly has neglected or declined to fulfill its obligations under the Constitution.  *Lawyer*, 521 U.S. at 576-578.  There is no void in the Election Code for the proposed order to fill.  The General Assembly has made its directive clear.  25 PA. STAT. § 3060(d).  Since the amended complaint alleges no constitutional violation that needs to be remedied, the Division Manager and the Board cannot use a consent decree to circumvent the limitations on their authority imposed by state law.  *Cleveland County Association for Government by the People v. Cleveland County Board of Commissioners*, 142 F.3d 468, 476-479 (D.C.Cir. 1998).

**VII.    Conclusion**

For the foregoing reasons, the amended complaint "fail[s] to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  The Defendants' motions to dismiss will be granted.  Docket Nos. 30 & 32.  The remaining five motions will be denied.  Docket Nos. 42, 43, 44, 52 & 58.  No opinion is expressed as to whether § 3060(d) imposes a "mandatory" duty of

enforcement on election officials, or as to whether those officials remain free to provide the access sought by PG on a "discretionary" basis. 25 PA. STAT. § 3060(f); *Holder*, 987 F.2d at 197-198. It suffices to say that the present circumstances do not justify "federal-court oversight" of the manner in which election officials in Allegheny County discharge their duties on Election Day. *Frew*, 540 U.S. at 441. Because § 3060(d) "does not target or single out" newspaper reporters for disfavored treatment, the First and Fourteenth Amendments do not forbid its enforcement against them. *Cohen*, 501 U.S. at 670. The claims asserted in PG's amended complaint will be dismissed with prejudice. Docket No. 28. Since any foreseeable amendment to the pleadings would be futile, PG will not be granted leave to amend its complaint. *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). An appropriate order follows.


<u>s/Nora Barry Fischer</u>
Nora Barry Fischer
United States District Judge

Date:   October 9, 2012

cc:     All counsel of record